J-S25035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: K.M.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.M.L. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3222 EDA 2023 |

Appeal from the Decree Entered November 21, 2023
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s): 2023-X2570

BEFORE: DUBOW, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED AUGUST 16, 2024**

K.M.L. appeals from the final decree, entered by the Montgomery County Court of Common Pleas ("orphans' court"), adjudicating K.M.L. to be totally incapacitated and appointing a plenary guardian of his person and of his estate. After careful review, we affirm.

On October 14, 2022, K.M.L. was admitted to Parkhouse Rehabilitation and Nursing Center ("Parkhouse") following his discharge from an inpatient psychiatric facility at Temple University Hospital, where he had also undergone surgery for colon cancer. On July 11, 2023, Parkhouse filed a petition for adjudication of incapacity and appointment of plenary guardians of the person and estate. In the petition, Parkhouse identified Commonwealth Guardian Services, LLC, as the proposed guardian of K.M.L.'s person and estate. The orphans' court appointed Carole Hendrick ("Attorney Hendrick") to represent

K.M.L. in the proceedings, and David A. Jaskowiak ("Attorney Jaskowiak") to serve as guardian ad litem to K.M.L.

Attorney Hendrick requested an independent medical evaluation of K.M.L, performed by Nicole Sestito, Ph.D. Dr. Sestito observed that K.M.L. displayed significant behavioral and psychiatric issues consistent with his history of schizophrenia and obsessive-compulsive disorder. Because of his difficulty communicating with others and understanding his physical and mental health conditions, Dr. Sestito proposed ongoing assistance and supervision. She asserted that he cannot live independently. While K.M.L. insisted he should return to working in construction and could stay in a shelter until finding an apartment, Dr. Sestito's report noted that he could not identify a means of securing housing and that his motor functions were so poor that he could not draw simple shapes. K.M.L. displayed extrapyramidal symptoms that are associated with the use of anti-psychotic medications including hand tremors, repetitive hand waving, an inability to sit still and eye blinking tics. While K.M.L. was prescribed Fluoxetine (Prozac), Olanzapine (Zyprexa) and Lorazepam (Ativan) to treat his schizophrenia and anxiety disorders, he believed he was not taking psychiatric medications and denied receiving a diagnosis for a mental health disorder of any kind. Ultimately, Dr. Sestito concluded that K.M.L.'s poor understanding of his own condition compromised his health and safety and that his schizophrenia is likely to progress despite treatment, increasing his already great need for support. She opined that

K.M.L. needs a permanent plenary guardian of his person and estate to ensure his safety.

Parkhouse staff observed that K.M.L.'s mood and interest in communicating with others fluctuated such that, at times, he was active, but would eventually withdraw and stay confined to his room for days. During periods where he would not leave his room, he would frequently use the sink as a toilet, and nursing staff could not determine if he would do so out of confusion or deliberately to cause his discharge from the facility. Staff also observed him picking at his skin, which caused sores. He would attend organized activities, such as exercise groups, but typically left within the first twenty minutes. Dr. Sestito observed that K.M.L. was significantly younger than the other residents on the locked floor where he resided, and that the general environment was unstructured and unsupervised. She asserted that such an environment is likely to cause decompensation for individuals with schizophrenia and that a guardian serving his best interest could help him find a more appropriate placement.

K.M.L. received assistance in bathing, dressing, and eating at Parkhouse and received the totality of his medical and psychiatric care through the facility. Robin Buono ("Buono"), director of Social Services for Parkhouse, testified at the guardianship hearing that during his time at the facility, K.M.L. had been "referred to psychology, but not to a psychologist," to address his widely variable skill scores, ranging from a five to a thirteen. N.T.,

11/21/2023, at 19. A nurse practitioner evaluated his health status on a regular basis and approved his medication regimen without input from a psychiatrist. Parkhouse policy directs staff to make psychiatric referrals if there is an "increase in behaviors or something of concern." *Id.* at 22. K.M.L. had not been referred to psychiatry within the five months preceding the guardianship hearing, and Buono was unable to provide the date he had been evaluated by a psychiatrist while at Parkhouse. The medical director and psychiatrist do not typically attend care conferences with other support staff to discuss residents' needs, and during the most recent care conference discussing K.M.L., the nurse practitioner was not in attendance. Rather, representatives from dietary, activities, and social works met to evaluate whether Parkhouse was providing for his needs.

On November 21, 2023, the orphans' court held the guardianship hearing over Zoom to allow K.M.L. to attend from Parkhouse. At the time of the guardianship hearing, K.M.L. was fifty-six years old, was not in contact with any family and had no children. In the four months prior to the hearing, he had not received any visitors. K.M.L. told Dr. Sestito that he had one friend who had expressed an interest in supporting him through the guardianship process, but the friend realized he could not fulfill the attendant responsibilities. Further, K.M.L. had no income or assets. During Dr. Sestito's testimony, however, K.M.L. became agitated and left the room. Attorney

Hendrick stated that K.M.L. held strong convictions as to his ability to live and work independently and could not tolerate discussion to the contrary.

Following the hearing, the orphans' court adjudicated K.M.L. totally incapacitated and appointed Kevin Ryan with Commonwealth Guardian Services as plenary guardian of his person and estate. The orphans' court found that his conditions of schizophrenia and anxiety disorder "totally impair his capacity to receive and evaluate information effectively, and to make and communicate decisions concerning management of his financial affairs or to meet essential requirements for his physical health and safety." *Id.* at 29-30. The court further found that no less restrictive alternative than plenary guardianship could fulfill his needs. This timely appeal followed.

K.M.L. raises the following issue for our review: "Did the orphans' court abuse its discretion by finding clear and convincing evidence that K.M.L. is totally incapacitated and in need of a plenary guardian of the person and estate?" K.M.L.'s Brief at 7.

We review the findings of an orphans' court according to a deferential standard of review. *In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016).

> When reviewing a decree entered by the [o]rphans' [c]ourt, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the [o]rphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions.

*Id.* (citation and paragraph break omitted).

"The selection of a guardian for a person adjudicated incapacitated lies within the discretion of the [orphans'] court whose decision will not be reversed absent an abuse of discretion." ***Est. of Haertsch***, 649 A.2d 719, 720 (Pa. Super. 1994). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." ***In re Duran***, 769 A.2d 497, 506 (Pa. Super. 2001) (citation omitted).

The Decedents, Estates and Fiduciaries Code ("the Code") defines an incapacitated person as "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. Any person interested in the alleged incapacitated person's welfare may petition the orphans' court to find such person incapacitated and for the appointment of a guardian of his person or estate. *Id.* § 5511(a). The petitioner must present testimony "from individuals qualified by training and experience in evaluating individuals with incapacities of the type alleged by the petitioner, which establishes the nature and extent of the alleged incapacities and disabilities and the person's mental, emotional and physical condition, adaptive behavior and social skills." *Id.* § 5518.

When adjudicating incapacity, the orphans' court is required to make findings of facts concerning:

> (1)  The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.
>
> (2)  The extent of the individual's capacity to make and communicate decisions.
>
> (3)  The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of less restrictive alternatives. …
>
> (4)  The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.
>
> (5)  The duration of the guardianship.

*Id.* § 5512.1(a). The court presumes mental competency and incapacity must be proven by clear and convincing evidence. *In re Hyman*, 811 A.2d 605, 608 (Pa. Super. 2002).

Notably, the Code states that guardianships should be "limited." 20 Pa.C.S. § 5512.1(a)(6). "A determination of incapacity is separate from a determination of whether a guardian should be appointed." *Id.* § 5512.1(a)(6)(i); *see also id.* § 5512.1(c) (stating that a court must find an alleged incapacitated person totally incapacitated to appoint a plenary guardian of the person). The orphans' court shall consider whether a less restrictive alternative to guardianship can meet a person's needs, even when

evidence clearly indicates incapacity. ***See In the Int. of M.A.***, 284 A.3d 1202, 1215 (Pa. Super. 2022).

> Less restrictive alternatives include, but are not limited to: [a]dvance directives such as durable power of attorney or trusts[;] [l]iving wills[;] [healthcare] powers of attorney, [healthcare] representatives[;] [f]inancial powers of attorney[;] [t]rusts, representative payees for individuals receiving Social Security benefits[;] Pennsylvania Achieving a Better Life Experience accounts[; and] [m]ental health advance directives.

20 Pa.C.S. § 5512.1(a)(3)(i-ix) (formatting omitted).

Here, K.M.L. concedes that the orphans' court correctly found that he is incapacitated. K.M.L.'s Brief at 19. K.M.L. contends, however, that Parkhouse failed to present evidence as to whether a less restrictive alternative to plenary guardianship might exist because they were unable to demonstrate an understanding of the services he needs. ***Id.*** at 30. In addition, K.M.L. avers that the orphans' court did not respect his wish to live independently, as is required by decisions of this Court. ***Id.*** at 25. He points to testimony provided by Buono at the guardianship hearing that indicated his psychiatric needs were unmet at Parkhouse. ***Id.*** at 28. Additionally, he relies upon Dr. Sestito's testimony regarding the unsuitability of the environment at Parkhouse and the likelihood that it will cause decompensation of his condition. ***Id.*** at 27.

The orphans' court found that the independent medical evaluation, along with Dr. Sestito's testimony, supported the decree appointing a permanent plenary guardian. Orphans' Court Opinion, 2/26/2024, at 2. Further, the

orphans' court referred to their stated concerns from the hearing about the appropriateness of Parkhouse as a placement for K.M.L., reiterating that the appointment of a guardian will assist K.M.L. in finding a placement suited to his age, medical condition, and desire to live productively. *Id.*

The record supports a finding that K.M.L. should be appointed a permanent plenary guardian and that no less restrictive alternative exists. K.M.L. exhibits a complete inability to apprehend or manage both his healthcare and financial needs. Guardianship Hearing, Exhibit G-2 (Dr. Sestito's Report), at 3. Although he is unhappy at Parkhouse, his condition challenges his ability to make decisions and communicate such that he cannot safely navigate his circumstances on his own. *Id.* He has no family connections or support system to rely on as an alternative to guardianship, nor does he understand the purpose of a power of attorney. *Id.* at 7. If he is allowed to leave Parkhouse, he has indicated that he will stay in a shelter until he can find an apartment. *Id.* at 4. The record reflects, however, that he has no income or assets. N.T., 11/21/2023, at 18.

According to Dr. Sestito, K.M.L. will likely require close psychiatric monitoring for the rest of his life. Dr. Sestito's Report at 3. K.M.L. denies, however, that he has been diagnosed with schizophrenia (or any mental health disorder), despite his prior medical history and hospitalizations for psychiatric conditions. *Id.* at 5. He is currently prescribed three psychiatric medications but denies taking any medication. *Id.* at 5. Dr. Sestito noted that K.M.L. is

not showing signs of neurodegeneration, but that he is at a high risk for early-onset dementia and will thus require regular monitoring so that his care can be adjusted accordingly. *Id.* at 3. He has been consistently medicated for psychiatric disorders for over one year and nonetheless displays significant symptoms, suggesting that he may be "treatment resistant." *Id.* at 4. He insists that he can live independently, but he lacks insight into his diagnoses to such an extent that he cannot appropriately consider his safety. *Id.* Although counsel for K.M.L., the guardian ad litem, Dr. Sestito, and the orphans' court acknowledged the insufficiency of the care he received at Parkhouse, K.M.L. is unable to advocate for himself because he does not appreciate how inadequate psychiatric care or unstructured interaction impairs his quality of life. *See* N.T., 11/21/2023, at 8, 28-29.

K.M.L. previously underwent colon cancer surgery, and his current health conditions include hypertension and hyperlipidemia. Dr. Sestito's Report at 3. He understands that he had a resection to remove colon cancer but does not think he needs any further treatment. *Id.* He exhibits symptoms associated with the long-term use of anti-psychotic medications, including strong hand tremors, which limit his ability to use a pen. *Id.* at 2; N.T. 11/21/2023, at 9-10. Like his lack of awareness of his mental health condition, he believes he has no physical limitations. Dr. Sestito's Report at 4.

K.M.L.'s cognitive functioning is at a level that severely limits his ability to communicate with others. *Id.* at 3. He was unable to complete the testing Dr. Sestito conducted because of restlessness, irritability, and difficulty focusing. *Id.* at 6. Dr. Sestito noticed that his speech suggested a thought disorder characterized by "a disorganized way of thinking" that causes difficulty expressing himself verbally. *Id.* at 3. During testing, K.M.L. would fixate on one of two topics and interrupt Dr. Sestito to expound on them: (1) his belief that Parkhouse is attempting to take his social security benefits and (2) that he was once a successful contractor. *Id.* at 6. As noted above, K.M.L. left the guardianship hearing because it upset him. N.T., 11/21/2023, at 11.

The above supports a finding that K.M.L. needs plenary guardianship of his person and estate pursuant to 20 Pa.C.S. § 5512.1(a), (c), and (e). Notably, K.M.L.'s mental health state, which is chronic and will only progress, establishes that he cannot meet essential requirements to address any of his financial or healthcare needs and thus requires complete assistance. *See* Orphans' Court Opinion, 2/26/2024, at 2; N.T., 11/21/2023, at 29-30.

We further find no abuse of discretion in the orphans' court's determination that there are no less restrictive alternatives available to meet the needs of K.M.L.'s person and estate. K.M.L. has no support outside of Parkhouse. K.M.L. is estranged from his family, has been divorced for around ten years, and has no children. *Id.* at 17. He has one friend who has been present for some care conferences, but he had not had a visitor in the four

months preceding the guardianship hearing. *Id.* at 17, 24. Although he identified a friend who was willing to support him, that individual recognized his inability to address K.M.L.'s needs. Dr. Sestito's Report at 4. Therefore, family and friends could not support K.M.L. *Cf. In re Peery*, 727 A.2d 539, 541 (Pa. 1999) (holding that guardianship is unnecessary regardless of a person's capacity if their needs are met through a support system of friends, family, or "other support").

Furthermore, the less restrictive alternatives contemplated by section 5512.1(a)(3)(i-ix) of the Code likewise do not apply to his circumstances. While options for less restrictive alternatives are not limited to those listed in the statute, K.M.L. presents no framework for how a limited guardianship could support him, only that he wishes to live on his own. In fact, despite ample contrary evidence presented at the hearing, K.M.L. denies having any ongoing health issues. Moreover, without establishing how he would do so, K.M.L.'s stated preference is to leave Parkhouse, live in a shelter, and resume working in the construction industry or as a cook. The orphans' court is not required to weigh K.M.L.'s wishes above the evidence supporting plenary guardianship where his desire to live independently would compromise his health and safety. *See In re Peery*, 727 A.2d at 540 (holding that the Court will not decide counter to the incapacitated person's wishes "as long as her decisions are rational and result in no perceivable harm to her").

The record supports the orphans' court finding that K.M.L. requires a plenary guardian of his person and estate and that no less restrictive alternative exists. We therefore find no abuse its discretion or legal error. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/16/2024